**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| JOSEPH JONAH HARLAN DEWS,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 5:25-CV-01477-AMK<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**MEMORANDUM OPINION AND ORDER** |

Plaintiff Joseph Jonah Harlan Dews seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Child Disability Benefits ("CDB") and Disability Insurance Benefits ("DIB"). (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF Doc. 11.)

For the reasons set forth below, the Court **AFFIRMS** the Commissioner's final decision.

## I. Procedural History

Mr. Dews filed his CDB application on December 20, 2022, alleging disability beginning July 19, 2005. (Tr. 65.) He alleged disability due to immunodeficiency, allergic rhinitis, extrinsic asthma, seizures, ventricular premature contractions, arthralgia, macrocephaly, tremors, depression, anti-polysaccharide antibody deficiency ("SAD"), anxiety, developmental delay, arthritis, and gastroesophageal reflux disease. (Tr. 66.) His application was denied at the initial level (Tr. 65) and upon reconsideration (Tr. 74). He then requested a hearing. (Tr. 100.)

On April 18, 2024, a video hearing was held before an Administrative Law Judge ("ALJ"). (Tr. 31-64.) The ALJ issued an unfavorable decision on June 28, 2024, finding Mr. Dews had not been under a disability from July 19, 2005, through the date of the decision. (Tr. 12-24.) Mr. Dews requested review of the decision by the Appeals Council. (Tr. 181-82.) The Appeals Council denied his request for review on May 27, 2025, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-7.)

Mr. Dews filed the instant Complaint on July 15, 2025 (ECF Doc. 1), and the matter is fully briefed (ECF Docs. 7 & 9). Mr. Dews raises the following assignments of error:

1) The ALJ erred when he failed to properly apply the criteria of Social Security Ruling 96-8p and consider all Plaintiff's impairments and related limitations when forming the residual functional capacity evaluation.

2) The ALJ committed harmful error when he failed to properly apply the criteria of Social Security Ruling 16-3p and failed to find that the intensity, persistence, and limiting effects of Plaintiff's symptoms precluded him from engaging in substantial gainful activity on a full-time and sustained basis.

(ECF Doc. 7, p. 1.)

## II. Evidence

### A. Personal and Vocational Evidence

Mr. Dews was born in 2005, was 0 years old on the alleged disability onset date, and was a younger individual under Social Security regulations at the time of the ALJ decision. (Tr. 66.) He has not worked since July 19, 2005, the alleged onset date. (Tr. 66.)

### B. Educational Evidence

Mr. Dews has a limited education.[1] (Tr. 23, 338.) Throughout preschool and elementary school, he received special education services and related services such as occupational therapy,

[1] At the time of his hearing, Mr. Dews was in 12th grade, and the ALJ found he had a limited education. (Tr. 23, 338 (indicating that Mr. Dews was a senior in the 2023-2024 school year).) It is not clear from the record whether he graduated high school.

physical therapy, and speech-language therapy. (Tr. 1068-69.) At different periods during elementary school, he attended school part-time and received home instruction. (*Id.*)

In eighth grade, Mr. Dews attended school and received special education services outside of the regular classroom setting for less than 21% of the school day. (Tr. 1067.) An Individualized Educational Program ("IEP") from eighth grade indicates that: Mr. Dews possessed an average IQ of 97; his academic skills ranged from low to average; his social emotional scores were clinically significant and showed serious areas of need; his adaptive skills were largely average; and he did not qualify for speech-language therapy because his language skills were appropriate. (Tr. 1069-75.)

When Mr. Dews was in twelfth grade, he still had an IEP. (Tr. 1222-37 (dated 1/8/2024).) His classes were within the general education curriculum, and he received all his instruction via online learning and home instruction. (Tr. 1223.) The IEP notes that he was respectful, hardworking, and strong in English/language arts, particularly in creative writing. (Tr. 1223.) His cognitive skills were average, and he did well on academic tasks with support. (Tr. 1223-24.) His gross motor skills were normal, his fine-motor/visual-motor/perceptual skills were average, and his social emotional/behavioral/executive functioning skills were average except for the areas of somatization, anxiety, and atypicality, which were "at risk." (Tr. 1224.) He hoped to pursue journalism in college (Tr. 1226) and enjoyed camping, fishing, playing cards, writing, and playing Dungeons and Dragons with friends and family (Tr. 1223).

### C. Medical Evidence

#### 1. Relevant Treatment History

On December 23, 2014, Mr. Dews was seen by neurology at Akron Children's Hospital. (Tr. 984.) His mother, Darlene Long ("Ms. Long"), reported observing seizure episodes since

Mr. Dews was five years old. (*Id.*) During these episodes, she observed generalized shaking and stiffening of Mr. Dews's body or lower extremities. (*Id.*) She also reported that Mr. Dews had a long history of frequent infections and treatment with rheumatology, immunology, and infectious disease specialists. (*Id.*)

On January 2, 2015, Mr. Dews underwent an electroencephalograph ("EEG") to evaluate his shaking episodes. (Tr. 982-83.) His most recent episode had taken place on December 22, 2014. (Tr. 982.) It lasted six minutes with generalized shaking; Mr. Dews was postictal after, returning to baseline in two to three hours. (*Id.*) The EEG was normal (*id.*), but the reviewing physician noted this did not rule out a seizure disorder (Tr. 983).

On April 28, 2015, Mr. Dews attended a neurology appointment with Abdalla Abdalla, M.D., at Akron Children's Hospital. (Tr. 983-97.) Ms. Long reported that she had seen him shaking and unresponsive that morning at 3:00 a.m. (Tr. 983.) The episode lasted five minutes. (*Id.*) Afterward, Mr. Dews was confused and complained of headaches. (*Id.*) These events occurred "at least a couple of times a week." (*Id.*) Dr. Abdalla noted that an MRI was attempted and aborted because Mr. Dews started shaking during the procedure; it was therefore difficult to determine whether he had actual seizures, pseudo seizures, or both. (*Id.*) On neurological examination, Mr. Dews was bright, alert, and interactive, he had age-appropriate attention span and concentration, and he displayed normal deep tendon reflexes, cranial nerves, sensation, gait, strength, muscle mass, and tone in all extremities. (Tr. 987.) Dr. Abdalla noted the following ongoing conditions: developmental delay, asthma, cardiac murmur and premature ventricular contractions, nonspecific arthralgia, hypoglycemia, and abnormal thrombophilia gene testing with homozygote for the MTHFR 677 gene and PAI-1 abnormal gene. (Tr. 986). He recommended elective V-EEG monitoring and scheduled an MRI with sedation. (Tr. 987.)

Mr. Dews attended a follow-up appointment with Dr. Abdalla on August 19, 2015. (Tr. 988-93.) Ms. Long reported that he still experienced episodes of waking in the night with tremors and shakes. (Tr. 988.) An MRI conducted on June 25, 2015 had showed new focus of T2 hyperintensity in the right globus pallidus. (Tr. 988, 990.) A recent coagulation profile was also abnormal. (Tr. 988.) A neurological examination was unchanged from the previous visit. (Tr. 992.) Dr. Abdalla instructed Mr. Dews to start taking baby aspirin (Tr. 988), referred him to hematology and genetics, and scheduled another MRI with sedation (Tr. 992).

On January 21, 2016, Mr. Dews returned to see Dr. Abdalla. (Tr. 993-99.) Ms. Long reported that he experienced shaking episodes that involved a blank stare and tremors of the arms and legs when he was stressed or sick. (Tr. 993.) Repeat coagulation testing was normal (Tr. 993-94), and a repeat MRI conducted on August 31, 2015, showed no enhancement of the previously noted right globus pallidus lesion, no new lesions, and no hydrocephalus (Tr. 996). A neurological examination remained unchanged, except that Mr. Dews now wore bilateral foot braces. (Tr. 998.) Dr. Abdalla instructed him to stop taking aspirin, re-scheduled V-EEG monitoring, and ordered follow-up with rheumatology. (Tr. 998-99.) No V-EEG monitoring records were evident in the record.

On July 14, 2016, Mr. Dews presented to Susan K. Klein, M.D., at Akron Children's Hospital neurology. (Tr. 999-1004.) He continued to experience seizures/tremors that consisted of blank staring, tremors of the arms and legs, and occasional unresponsiveness. (Tr. 1001.) The episodes lasted for a few minutes every day, usually occurring around noon and five p.m. (*Id.*) He was not yet taking medication because the etiology of the events was unclear. (*Id.*) On neurological examination, Mr. Dews: could speak in full sentences with prompting; had normal cranial nerves; walked with pronating gait that was corrected by his braces; was unable to walk

with a tandem stance for more than 5-6 seconds; had a fine tremor with hand extension; could go up and down stairs with a railing; displayed normal strength in all extremities; had slightly decreased tone to passive range of motion of the ankles bilaterally; and demonstrated normal reflexes and sensation. (Tr. 1003-04.) Dr. Klein recommended continuing present management of all his conditions. (Tr. 1004.)

On January 13, 2017, Mr. Dews attended a neurology follow-up with Dr. Klein. (Tr. 1005-12.) He reported symptoms of: crying easily; social isolation; leg pain that worsened with activity, woke him up from sleep, and was helped with Tylenol; burning pain in the chest independent of eating or stress; headaches twice a week that were worse with activity and at times required him to lay down; and gagging when eating, with worsening gag reflux. (Tr. 1007.) A neurological examination showed: he was alert but slow to respond, looking to his mother to respond for him; he reported a happy mood, but then refused to respond and appeared to cry when probed further; he walked with a normal gait while wearing ACO braces; and he had normal cranial nerves, normal reflexes and sensation, and normal motor with full strength throughout and very mild hypotonia in arms and legs. (Tr. 1009.) Dr. Klein opined that anxiety likely contributed to Mr. Dews's symptoms, noting the lack of catastrophic infectious illnesses, localizing neurologic deficits, or evidence of joint destruction in his medical history. (Tr. 1010.) She recommended follow-up with rheumatology and genetics and a focus on normalizing his routine, particularly sleep hygiene. (*Id.*) She also referred him to psychology, physical therapy, and aquatic therapy, ordered a repeat MRI, and prescribed Cymbalta and melatonin. (Tr. 1011.)

On October 27, 2017, Mr. Dews returned to see Dr. Klein. (Tr. 1012-20.) Ms. Long reported that he experienced fatigue, pain, heart racing, tremors, and night terrors. (Tr. 1015.) He had not followed through with psychology or Cymbalta since his last neurology appointment,

nor had he undergone the repeat MRI. (*Id.*) He underwent counseling and physical therapy at school, which he did not attend in person full time. (Tr. 1015, 1017.) Recent genetic testing had shown no high impact findings. (Tr. 1016.) A neurological examination was unchanged from the previous visit. (Tr. 1018-19.) Dr. Klein noted concerns about depression and again referred Mr. Dews to psychology and prescribed Cymbalta. (Tr. 1019.) She also prescribed melatonin, referred Mr. Dews to physical and aquatic therapy, ordered a repeat MRI, and recommended an extended EEG. (Tr. 1019-20.)

On June 10, 2021, Mr. Dews saw his pediatrician, Erin Weber, M.D., at Community Health Care. (Tr. 482-85.) He reported pervasive migraine headaches lasting four days, tremors but no major seizures, and symptoms of coughing, nasal drainage, sore throat, and low-grade fever. (Tr. 482.) A strep test was negative. (Tr. 484.) Dr. Weber diagnosed acute non-recurrent pansinusitis, acute upper respiratory infection ("URI"), pain in throat, and bronchospasm, acute. (Tr. 484.) She prescribed cefdinir and prednisone, continued albuterol sulfate and Symbicort for asthma, and recommended fluids, head elevation, and over the counter medications. (*Id.*)

Mr. Dews again presented to Dr. Weber with cold symptoms and/or headaches on September 15, November 11, and December 29, 2021. (Tr. 478, 474, 470.) In September and November, Dr. Weber's diagnoses and treatment recommendations again included a URI or a viral infection and over the counter medications, cefdinir, and prednisone. (Tr. 480, 476.) In December, Mr. Dews tested positive for Covid-19, and Dr. Weber recommended rest, fluids, over the counter medications, and quarantine for at least five days. (Tr. 472.)

On February 24, 2022, Mr. Dews attended a gastroenterology appointment with Christine Pasquarella, M.D. (Tr. 531-35.) He had not been seen by gastroenterology since September 2020 and was taking 40mg Prilosec to treat ongoing dysphagia. (*Id.*) He reported his symptoms

had mostly resolved with medication and dietary changes. (*Id.*) Dr. Pasquarella recommended continuing Prilosec 40 mg with annual lab monitoring and follow up in one year. (Tr. 534.)

On March 17, 2022, Mr. Dews underwent a consultative examination with Bryan J. Krabbe, Psy.D. (Tr. 444-49.) His mother, Ms. Long, served as the primary informant. (Tr. 444.) Mr. Dews was 16 years old and weighed 257 pounds. (Tr. 445.) Ms. Long reported that his developmental milestones were delayed as an infant, and he had an IEP in school, but she denied that he had disciplinary problems or trouble staying focused and said he got along well with teachers and peers. (*Id.*) She further reported that Mr. Dews had a difficult time functioning when sick, and he dealt with anxiety, social withdrawal, and insomnia. (Tr. 445-46.) Regarding the activities of daily life, Mr. Dews spent his time playing video games and writing, and he struggled to manage personal hygiene and complete chores. (Tr. 446.) Dr. Krabbe observed that Mr. Dews: was fidgety but cooperative and appropriately engaged; displayed adequate hygiene and grooming; spoke articulately and within normal limits; had clear and logical thought processes; appeared nervous; made limited eye contact; displayed appropriate attention; and followed directions. (Tr. 446.) He administered a Wechsler Adult Intelligence Scale – IV (WAIS-IV) test, which indicated that Mr. Dews's full IQ score was 87, in the low average/average range. (Tr. 447.)

On May 16, 2022, Mr. Dews attended an immunology appointment with Jinzhu Li, M.D., to follow-up on asthma and SAD. (Tr. 526-30.) His mother reported that in the last few months he "had been doing very well . . . no chronic cough," he had rarely needed albuterol, and he had not required treatment with antibiotics. (Tr. 526.) Dr. Li noted that laboratory findings from the previous year showed Mr. Dews had outgrown SAD. (*Id.*) On physical examination, Mr. Dews was obese, but his heart rate and rhythm, pulmonary effort, breath sounds, and range of motion

were normal. (Tr. 529.) He had a rash on his arms, torso, and lower extremities. (Tr. 530.) Dr. Li continued established asthma treatments, noting that asthma was well controlled. (*Id.*)

On June 8, 2022, Mr. Dews attended a rheumatology appointment with Nancy Delnay, APRN-CNP. (Tr. 521-25.) He reported pain in both legs due to the weather change as well as constant pain in the lower legs, back, and forearms not specific to a joint. (Tr. 521-22.) His mother said Celebrex was working and denied joint swelling, morning stiffness, and limping. (Tr. 522.) Mr. Dews did not report any difficulty using stairs, turning a doorknob, or walking. (Tr. 523.) His physical examination revealed normal range of motion without pain and no muscular tenderness in the cervical back, normal gait, and normal range of motion generally. (Tr. 524-25.) APRN Delnay diagnosed arthralgia, unspecified joint, ligament laxity, and long-term use of non-steroidal anti-inflammatories ("NSAID"). (Tr. 525.) She continued Celebrex, recommended Tylenol as needed, and reviewed exercise guidelines. (*Id.*) She referred Mr. Dews for orthotics and recommended follow-up in one year. (*Id.*)

On July 29, 2022, Mr. Dews attended an annual well child visit with Dr. Weber. (Tr. 461-65.) His mother expressed concerns with his overall health and development, reporting that he was schooled at home, ate balanced meals, exercised regularly, had a small friend group with whom he played games, and most recently had a seizure in May. (Tr. 461-62.) Mr. Dews scored 1 on a depression screening (Tr. 461), and his physical examination was normal throughout (Tr. 463). During 2022, before and after this visit, Mr. Dews presented to Dr. Weber at least four times with symptoms of congestion, coughing, muscle aches, headaches, and/or low-grade fever. (Tr. 466-68 (3/28/2022), 457-59 (10/10/2022), 453-55 (12/7/2022), 450-52 (dup. at 726-28) (12/30/2022).) Apart from URI symptoms, physical examinations were normal throughout and Mr. Dews had no fever in the office. (Tr. 451, 454-55, 458-59, 467-68.) Dr.

Weber typically diagnosed a URI and/or bronchitis or pansinusitis, prescribed cefdinir and/or prednisone, and recommended fluids and over the counter medication. (Tr. 452, 455, 459, 468.)

On November 14, 2022, Mr. Dews followed up with Dr. Li regarding asthma and immunity issues. (Tr. 516-19.) Ms. Long reported that he always developed a fever and URI symptoms after dental procedures. (Tr. 516.) A physical examination of Mr. Dews was normal. (Tr. 518-19.) Dr. Li noted that the URI symptoms after the dentist were likely coincidental but ordered a recheck of Mr. Dews's immune labs. (Tr. 519.) He also noted that Mr. Dews's asthma was well controlled, and his spirometry was normal. (*Id.*)

On February 8, 2023, Mr. Dews attended a follow-up appointment with APRN Delnay in rheumatology. (Tr. 505-10 (dup. at 773-77).) His mother denied that he had morning stiffness or limping but reported that he dragged his right leg and had increased pain some days. (Tr. 505.) Mr. Dews wore AFOs on both feet (*id.*) and had a rash on his face, extremities, and trunk (Tr. 506). He reported no difficulty going upstairs or walking, and his physical examination showed normal range of motion without pain and normal gait. (Tr. 507-08.) APRN Delnay diagnosed rash and nonspecific skin eruption, arthralgia, unspecified joint, ligament laxity, and long-term use of NSAIDs. (Tr. 509-10.) She found no evidence of lupus or arthritis and ordered an x-ray of the hips and pelvis to rule out "scfe, legg-calves perthes." (Tr. 510.) She also referred Mr. Dews to dermatology for the rash, ordered labs, and instructed him to increase Celebrex to twice a day for pain if needed. (*Id.*)

Mr. Dews returned to see Dr. Li on April 10, 2023. (Tr. 500-04.) Ms. Long reported that he had been doing well but was experiencing ongoing shortness of breath, despite taking his asthma medications. (Tr. 500.) On examination, pulmonary effort and breath sounds were

normal. (Tr. 503-04.) Dr. Li concluded that the ongoing shortness of breath was likely due to a viral respiratory illness and continued Mr. Dews's medications unchanged. (Tr. 504.)

On June 26, 2023, Mr. Dews again saw APRN Delnay in rheumatology. (Tr. 703-08 (dup. at 761-66).) He reported swelling in the left leg later in the day and stiffness in the morning. (Tr. 703.) Ms. Long also reported that Mr. Dews's face became bright red in the evenings or when he was stressed and said a rash was spreading to his upper arms and legs with large papules. (*Id.*) On examination, Mr. Dews's gait was normal, he reported no joint pain or difficulties going up stairs and walking, and he had full range of motion without pain. (Tr. 705-06.) A pelvis x-ray from February 2023 was normal. (Tr. 708.) APRN Delnay ordered an x-ray of the left ankle, continued Celebrex, and again referred Mr. Dews to dermatology. (*Id.*)

On July 10, 2023, Mr. Dews attended a rheumatology appointment with Christine Bearer, M.D. (Tr. 755-60.) The left ankle pain and swelling reported at the previous visit had improved, and an x-ray of the left ankle had been negative. (Tr. 755.) Mr. Dews reported stiffness in the lower extremity joints during weather changes and ongoing bilateral lower extremity pain despite wearing his orthotics, but he said taking Celebrex twice a day had helped. (*Id.*) His physical examination showed: normal gait; tight hamstrings and hip flexors bilaterally; no tenderness in the joints; and full muscle strength and range of motion in the extremities. (Tr. 758.) Dr. Bearer recommended continued orthotic use, home exercise, and stretching. (Tr. 760.)

On August 24, 2023, Mr. Dews presented to Dr. Pasquarella for a gastroenterology follow-up. (Tr. 750-54.) He reported his symptoms of dysphagia, reflux, and abdominal pain only occurred when he forgot to take his medication for a few days (Tr. 750), but he still experienced some heartburn and seizures (Tr. 753). His physical examination was normal

throughout. (*Id.*) Dr. Pasquarella recommended limiting triggering foods, continuing Prilosec 40mg, and returning in one year. (Tr. 754.)

On September 18, 2023, Mr. Dews attended a psychiatric evaluation with Lori Schreiner, BSN, MSN, APRN. (Tr. 936-42 (dup. at Tr. 1040-46).) Ms. Long reported that he had a stable mood most days with occasional low days and denied difficulty with irritability or anger. (Tr. 937.) Mr. Dews struggled with insomnia and broken sleep, felt guilt/worthlessness/hopelessness one to two days a month, and had anxiety a few days per week. (*Id.*) He denied suicidal ideation and reported intact appetite, intact interest/pleasure, and varying energy/motivation. (*Id.*) A mental status examination showed full orientation, normal speech, "okay" mood, near euthymic affect, logical thought content, adequate attention and concentration, intact associations and memory, and fair insight and judgment. (Tr. 940.) APRN Schreiner diagnosed major depressive disorder ("MDD") and generalized anxiety disorder ("GAD") (Tr. 940), prescribed Lexapro 10 mg daily, and recommended continuing counseling (Tr. 937).

On October 30, 2023, Mr. Dews followed up with APRN Schreiner. (Tr. 1060-64.) He reported his symptoms continued but were better with Lexapro. (Tr. 1060.) Lexapro was increased to 20 mg daily. (*Id.*) A mental status examination was unchanged from the previous appointment (Tr. 1061) and remained largely unchanged at psychiatry appointments in February and April 2024 (Tr. 1055, 1049). On February 12, 2024, Mr. Dews reported "ups and downs" but no "super bad thoughts" (Tr. 1053), and he presented as psychiatrically stable with occasional and managed mood instability (Tr. 1054). On April 28, 2024, he reported increased mood instability, anxiety, and insomnia. (Tr. 1048.) APRN Schreiner weaned Lexapro and prescribed Zoloft and hydroxyzine. (*Id.*)

Mr. Dews presented to Dr. Weber on November 9, 2023 with coughing, vomiting, and headache. (Tr. 1260.) A strep test was positive. (Tr. 1261.) Dr. Weber diagnosed strep pharyngitis, URI, bronchospasm, and acute vomiting. (*Id.*) She prescribed cefdinir and prednisone and recommended fluids and over the counter medications. (Tr. 1261-62.) Mr. Dews returned to see Dr. Weber on March 20, 2024, reporting deep cough, slight fever, diffuse muscle aches, headaches, and tremor spells. (Tr. 1251.) His physical examination was overall normal. (Tr. 1252.) Dr. Weber diagnosed acute bronchospasm and viral illness, prescribed prednisone, and recommended fluids and over the counter medications. (Tr. 1252-53.)

**2. Opinion Evidence**

**i. Consultative Examiner**

On March 17, 2022, consultative examiner Dr. Krabbe examined Mr. Dews (Tr. 444-47) and diagnosed adjustment disorder with mixed anxiety and depressed mood (Tr. 448). He found that Mr. Dews: was of average intelligence; displayed effective task persistence when answering questions; interacted in an age-appropriate manner; and had less than an age-appropriate management of self-care with personal hygiene, dressing, and completing chores. (Tr. 449.)

**ii. State Agency Consultants**

On May 4, 2023, state agency medical consultant W. Scott Bolz, M.D., reviewed Mr. Dews's medical records and concluded that he had no severe physical impairments. (Tr. 70.) On September 11, 2023, on reconsideration, state agency medical consultant Abraham Mikalov, M.D., reviewed updated records and affirmed Dr. Bolz's findings. (Tr. 78-79.)

On May 23, 2023, state agency psychological consultant David Dietz, Ph.D., reviewed Mr. Dews's mental health records and concluded that he had no severe mental impairment. (Tr. 71-72.) On October 14, 2023, on reconsideration, state agency psychological consultant Irma

Johnston, Psy.D., reviewed updated records and found Mr. Dews's depressive disorder to be severe. (Tr. 79.) She opined that Mr. Dews retained the ability to: understand, remember, and carry out short and simple instructions; concentrate and persist for a variety of simple tasks in a predictable work environment without fast-paced requirements or strict production quotas; and adapt/manage himself in a structured and predictable work setting where major changes are explained, and he is given time to adjust to new expectations. (Tr. 82-83.)

**D. Function Report**

On April 10, 2023, Ms. Long completed a Function Report – Child on behalf of Mr. Dews. (Tr. 300-07.) She reported that Mr. Dews had trouble seeing after seizures and tremor spells. (Tr. 301.) He had no problems hearing or speaking (Tr. 301-02), but he experienced trouble communicating after seizures or tremor spells or when very sick (Tr. 303). His daily activities were limited in that he did all his schooling at home and otherwise limited contact with people due to his low immune system. (Tr. 303.)

Mr. Dews's physical abilities were limited in that he wore AFOs on both legs and had issues with balance and using stairs. (Tr. 304.) He did not have friends his own age and could not make new friends because he did not attend school. (Tr. 305.) With respect to understanding and using what he learned, he was limited in that he needed a calculator to multiply, divide, or subtract, his teacher helped with grammar, and he did not understand the value of money. (Tr. 304.) With respect to personal needs and safety, he could not care for personal hygiene, wash and put away clothes, help around the house, cook a meal, take medication alone, use public transportation alone, or ask for help when needed. (Tr. 306.) With respect to paying attention and staying on task, he could not keep busy on his own, did not work on arts and crafts projects, and could not complete homework or chores without one-on-one assistance. (Tr. 307.)

### E. Hearing Testimony

At the video hearing on April 18, 2024, Mr. Dews and his mother, Ms. Long, testified in response to questions from the ALJ and Mr. Dews's attorney. (Tr. 39-60.)

A Vocational Expert ("VE") also testified. (Tr. 61-63.) The VE testified that a hypothetical individual of Plaintiff's age, education, and work experience, with the functional limitations described in the ALJ's RFC determination, could perform representative positions in the national economy, including mail clerk, office helper, and sales attendant. (Tr. 62.) He also testified that it would preclude competitive employment if the person would either be off task 15% of the workday or absent more than two days a month. (Tr. 62-63.)

## III. Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform other work available in the national economy. *Id.*

## IV. Law & Analysis

### A. Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245

F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B. First Assignment of Error: The ALJ Complied with SSR 96-8p and Adequately Considered All of Plaintiff's Impairments When Formulating the RFC**

In his first assignment of error, Plaintiff argues that the ALJ failed to properly apply Social Security Ruling ("SSR") 96-8p and consider the limitations caused by all of his physical and mental impairments, severe and non-severe, when determining the RFC. (ECF Doc. 7, pp. 1, 9-14.) The Commissioner argues in response that the ALJ properly considered all of Plaintiff's impairments and made findings supported by substantial evidence. (ECF Doc. 9, pp. 5-9.)

SSR 96-8p provides that "[t]he RFC assessment must be based on *all* of the relevant evidence in the case record," explaining further:

> In assessing [the] RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe." While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim.

SSR 96-8p, *Assessing Residual Functional Capacity in Initial Claims*, 61 Fed. Reg. 34474, 34477 (July 2, 1996) (emphasis in original). The Sixth Circuit also recognizes that an ALJ must consider "the combined effect of all of the claimant's impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity to render the claimant disabled." *Walker v. Sec'y of Health & Hum. Servs.*, 980 F.2d 1066, 1071 (6th Cir. 1992).

In support of his assertion that the ALJ "clearly failed to consider the totality of [Plaintiff's] impairments and their relating limitations when forming his RFC," Mr. Dews simply copies and pastes his prior summary of the medical records before asserting generally that the ALJ "failed to include any . . . limitations related to Plaintiff's complaints regarding his physical or psychological limitations" in the RFC. (ECF Doc. 7, pp. 10-13; *compare id.* at pp. 2-5.) He then asserts more specifically that the ALJ failed to consider limitations caused by his frequent

infections, breathing issues, chronic arthralgia, and psychological disorders, but offers no further explanation or discussion to support his conclusory assertions.[2] (*Id.*)

Beginning with Plaintiff's "frequent infections," a review of the ALJ's written decision reveals that he considered and accounted for both Plaintiff's frequent respiratory illnesses and his history of immunodeficiency. First, the ALJ observed that "[t]he record does document a history of frequent presentations for respiratory illnesses and symptoms" but found "none of these episodes is shown to have lasted for an overly long period." (Tr. 17.) Thus, to the extent that Mr. Dews had symptoms that were "the result of an impairment such as allergic rhinitis," the ALJ found the impairment to be non-severe. (*Id.*) Nevertheless, the ALJ confirmed that he "considered all of the claimant's medically determinable impairments, including those that are not severe, when assessing the claimant's residual functional capacity." (Tr. 18.)

Second, the ALJ acknowledged Plaintiff's history of immunodeficiency, but observed that his treating immunologist stated in May 2022 "that laboratory findings from the prior year demonstrated the claimant had outgrown this condition," and that Mr. Dews no longer required prophylactic antibiotics as of February 2022. (Tr. 18 (citing Tr. 526, 534).) The ALJ therefore found immunodeficiency was not a medically determinable impairment (*id.*), a finding that was not challenged by Plaintiff (*see* ECF Doc. 7). The ALJ was therefore not required to consider immunodeficiency when formulating the RFC. *See* 20 C.F.R. § 404.1529(b) ("Your symptoms . . . will not be found to affect your ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present.").

[2] This lack of developed argument is sufficient to support a finding that Mr. Dews waived his first assignment of error. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal citations omitted) (alterations in original). The Court will consider the merits of the first assignment of error in this case, to the extent possible considering Plaintiff's underdeveloped argument, but counsel is cautioned that future arguments that are supported only by a general recitation of medical findings and conclusory assertions of error may be deemed waived and not decided on the merits.

Turning to Plaintiff's assertion that the ALJ did not consider the limitations resulting from his "breathing issues" (ECF Doc. 7, p. 13), a review of the written decision reveals that the ALJ found asthma to be a severe impairment (Tr. 17), considered Plaintiff's normal pulmonary testing and the observations of his treating physicians that his "asthma is well controlled with conservative medications and treatments" (Tr. 21 (citing Tr. 519)), found Plaintiff "must avoid concentrated exposure to pulmonary irritants" in order "[t]o reduce the risk of asthma exacerbation" (*id.*), and adopted an RFC containing that limitation (Tr. 20). Thus, the ALJ adequately accounted for limitations resulting from Mr. Dews's breathing issues.

As to Plaintiff's "chronic arthralgia" (ECF Doc. 7, p. 13), a review of the ALJ's decision reveals that he found chronic arthralgia to be a severe impairment (Tr. 17), acknowledged that Plaintiff complained of complications, had a history of ligament laxity, and wore orthotic devices on both feet (Tr. 21 (citing Tr. 703)), but concluded that the complications from his arthralgias were not as severe as he claimed given that his physical exams consistently showed full strength and range of motion, the "great majority" of his exams also showed no signs of swelling in the feet and ankles, he exhibited no problems walking, standing, or climbing stairs, and he reported going fishing and camping, "indicating basic ability to navigate a variety of surroundings without issue" (*id.* (citing Tr. 705, 758, 1223)). The ALJ then adopted an RFC limiting Plaintiff to light work, with climbing limitations "due to the extent of the claimant's obesity." (Tr. 20, 21.) Thus, the ALJ adequately accounted for limitations resulting from Plaintiff's chronic arthralgia.

Finally, turning to Plaintiff's "psychological disorders" (ECF Doc. 7, p. 13), a review of the ALJ's decision reveals that he found MDD and GAD to be severe impairments (Tr. 17) and gave a detailed breakdown of Mr. Dews's reported activities, school records, and clinical findings relevant to each of the four categories of mental functioning, finding "mild" or

"moderate" limitations in each category (Tr. 18-19). At Step Four, the ALJ explained in detail why Mr. Dews's allegations of disabling mental limitations were not entirely consistent with the record. (Tr. 21.) He noted that IQ testing showed Mr. Dews to be of average intelligence (*id.* (citing Tr. 447)) and school records indicated he was doing well, showed significant progress in reading and writing, and wanted to attend college (*id.* (citing Tr. 1226)). The ALJ found Plaintiff's mental health treatment to be "very conservative" (*id.*) and observed that mental status exams documented variable eye contact, nervousness, and signs of depressed mood but did not document coinciding behavioral problems or difficulty following directions or completing tasks (*id.* (citing Tr. 447, 937)). He considered Plaintiff's statements that he enjoyed camping, fishing, and playing role-playing and card games with friends. (*Id.* (citing 1226).) He also found the opinion of state agency psychological consultant Dr. Johnson to be "generally consistent with [Plaintiff's] demonstrated ability to understand, follow, and complete a variety of tasks, as seen both in medical and education records" (Tr. 22), and adopted a mental RFC finding Mr. Dews able to: understand and remember short, simple instructions; attend to and carry out simple, routine tasks in a predictable environment without fast-paced requirements or strict production quotas; and tolerate infrequent changes that are explained or demonstrated in advance (Tr. 20). The ALJ thus adequately accounted for limitations relating to Plaintiff's mental impairments.

Although Mr. Dews provides a summary of the evidence he apparently believes supports his arguments, he does not identify material evidence that the ALJ either misrepresented or failed to address. (*See* ECF Doc. 9, pp. 10-13.) Having reviewed the underlying evidence and the ALJ's written decision, the Court concludes that the ALJ's analysis was sufficient to support a finding that he both considered the evidence as a whole and reached a reasoned conclusion. Mr. Dews certainly has not shown that the ALJ's findings lacked the support of substantial evidence.

For the reasons stated above, the Court finds that Mr. Dews has not shown that the ALJ failed to comply with SSR 96-8p or that the RFC findings lacked the support of substantial evidence. Accordingly, the Court finds the first assignment of error lacks merit.

**C. Second Assignment of Error: The ALJ Properly Applied SSR 16-3p**

In his second assignment of error, Mr. Dews argues that the ALJ failed to properly evaluate his symptoms under SSR 16-3p and erred in finding his subjective complaints were not entirely consistent with the evidence. (ECF Doc. 7, pp. 14-22.) Specifically, he asserts that the ALJ failed to properly account for: (1) the limitations caused by "frequent infections" that "preclud[ed] him from even attending school on a regular and full-time basis"; and (2) the "pain related to his continuing problems" that "precluded his ability to complete work on a sustained and full-time basis." (*Id*. at pp. 20-22.) The Commissioner responds that the ALJ complied with SSR 16-3p by discussing and considering the relevant evidence before concluding that Mr. Dews's symptoms were not as disabling as alleged. (ECF Doc. 9, pp. 9-13.)

**1. Legal Standard for Evaluation of Subjective Symptoms**

As a general matter, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476; *see Alexander v. Kijakazi*, No. 1:20-CV-01549, 2021 WL 4459700, at *13 (N.D. Ohio Sept. 29, 2021) ("An ALJ is not required to accept a claimant's subjective complaints.") (citing *Jones*, 336 F.3d at 476); *see also* 20 C.F.R. § 404.1529(a) and SSR 16-3p, *Evaluation of Symptoms in Disability Claims*, 82 Fed. Reg. 49462, 49463 (Oct. 25, 2017) (explaining that a claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability).

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable

physical or mental impairment that could reasonably be expected to produce the claimant's symptoms. SSR 16-3p, 82 Fed. Reg. at 49463; *Rogers v. Comm'r Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)). If that requirement is met, the second step is to evaluate the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities. SSR 16-3p, 82 Fed. Reg. at 49463; *Rogers*, 486 F.3d at 247. There is no real dispute that the first step is met in this case (Tr. 20), so the discussion will focus on the ALJ's compliance with the second step.

In undertaking this analysis, an ALJ should consider objective medical evidence, subjective complaints, prior work records, and information from medical and non-medical sources. SSR 16-3p, 82 Fed. Reg. at 49464-49466; 20 C.F.R. § 404.1529(c)(3). Relevant factors include daily activities, types and effectiveness of medications, treatments to address symptoms, and other factors concerning functional limitations due to pain or other symptoms. SSR 16-3p, 82 Fed. Reg. at 49465-49466; 20 C.F.R. § 404.1529(c)(3). An ALJ need not discuss all factors he considers, only those he finds pertinent to the case. SSR 16-3p, 82 Fed. Reg. at 49467.

**2. The ALJ Appropriately Evaluated Plaintiff's Subjective Complaints**

First, Mr. Dews argues without elucidation that the ALJ "failed to include the fact that [Plaintiff] was limited due to his frequent infections when he left his home, precluding him from even attending school on a regular and full-time basis." (ECF Doc. 7, p. 20.) As discussed in Section IV.B., *supra*, the ALJ explicitly considered Plaintiff's history of "frequent presentations for respiratory illnesses and symptoms" and "[c]omplaints of immunodeficiency," but found allergic rhinitis non-severe because none of the episodes "lasted for an overtly long period" and found immunodeficiency not medically determinable because the medical evidence showed Mr. Dews had outgrown the condition. (Tr. 17-18.) Plaintiff's conclusory assertion that the ALJ failed to consider the impact of his frequent infections is thus not supported by the record.

Second, Mr. Dews argues that the ALJ "failed to account for Plaintiff's pain relating to his continuing problems," citing three office visits where Mr. Dews reported pain. (ECF Doc. 7, p. 20 (citing Tr. 521 (6/8/22 rheumatology visit, complaining of "leg pain due to the weather change"), 522 (same visit, discussing complaints of pain not specific to any joint in connection with "long term arthralgia with ligament laxity"), 753 (8/24/23 gastroenterology visit, with review of symptoms positive for joint pain), 755 (7/10/23 rheumatology visit, noting continued complaints of bilateral lower extremity pain).) As with his prior arguments, Mr. Dews provides no further discussion to support his assertion that the ALJ failed to account for his pain.

A review of the ALJ's written decision reveals that he found both obesity and "chronic arthralgia" to be severe impairments (Tr. 17, 21), determined based on "mostly unremarkable" physical examination findings that Plaintiff's "obesity either singularly, or in combination with his other medically determinable severe impairments, does not result in limitations greater than those assessed in [the RFC]" (Tr. 18), and concluded that Plaintiff's physical exams, which "d[id] not show any serious problems with standing, walking, and or weight bearing activity," and activities like fishing and camping that "indicate[d] basic ability to navigate a variety of surroundings without issue" together evidenced a level of functioning that indicated Plaintiff's "complications of arthralgias are not as severe as claimed" (Tr. 20-21). In so finding, the ALJ acknowledged Plaintiff's "history of ligament laxity and wearing orthotic devices on both feet," but contrasted that with the lack of evidence of "difficulties climbing stairs, standing, or walking," and physical exams that consistently showed "full muscle strength and range of motion in his extremities" and did not corroborate Plaintiff's "complaints of frequent swelling in the feet and ankles." (Tr. 21.) The ALJ also considered the opinions of the state agency medical consultants, who found that Plaintiff's physical impairments were not severe, but gave them

"little persuasive effect" in light of the severity of Plaintiff's obesity. (Tr. 22.) The ALJ then adopted an RFC that limited Mr. Dews to light exertional work with specified climbing limitations and restricted exposure to pulmonary irritants. (Tr. 20, 21.)

After discussing Mr. Dews's medical records, activities, and reported symptoms, the ALJ summarized his findings related to Mr. Dews's subjective reports and RFC as follows:

> In sum, the above residual functional capacity assessment is supported by the reasonable inferences to be drawn from the objective evidence of record. As discussed above, the claimant's allegations are inconsistent with what the objective evidence suggests in terms of functional restriction. While the evidence supports the existence of his complained of severe impairments, it does not support the specifics of his allegations concerning the severity and frequency of the related symptoms. Ultimately, I find that the objective evidence of record does not support greater restrictions than detailed above in the residual functional capacity finding. In reaching this conclusion, I have reviewed the entirety of the record, considered each of the claimant's subjective complaints, and have considered each of the claimant's medically determinable impairments.

(Tr. 22-23.)

The ALJ's decision thus considered the factors set forth in SSR 16-3p, contained "specific reasons for the weight given to the individual's symptoms," and made findings that were "consistent with and supported by the evidence." SSR 16-3p, 82 Fed. Reg. at 49467. Reading the decision as a whole, the undersigned finds he "clearly articulated [his reasoning] so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." (*Id.*) The Court therefore concludes that the ALJ complied with SSR 16-3p when he found the "intensity, persistence and limiting effects" of Plaintiff's symptoms was not "entirely consistent" with the record. (Tr. 20.)

For the reasons explained above, the Court finds Mr. Dews has not met his burden to show that the ALJ erred in evaluating his symptoms or that his analysis lacked the support of substantial evidence. Accordingly, the Court finds the second assignment of error lacks merit.

## V. Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's final decision.

September 1, 2026

*/s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge